May it please the Court, Brendan Donkers here on behalf of the Appellant, I'd like to reserve five minutes for rebuttal. Okay, I will try and help you. Thank you, Your Honor. This is a flat rating case under the FDCPA. Flat rating is where a third party is hired to send demand letters to debtors. These letters create the impression... Well, if that's all they did, that would be correct, but doesn't the case law suggest that there are other factors that we look to that might take them out of the conclusory category of flat raters? In other words, it's not illegal to schedule the arrangement by paying a fixed amount of money per file, is it, if you actually take active steps to collect the debt? That's right, Your Honor. And this is obviously a fact-heavy determination, and that's why we relied so heavily on the Vincent case, because the Vincent case from the Second Circuit, Vincent v. The Money Store, written by the Chief Judge there a couple years ago, addresses this issue that the Court's raising, which is that... Counsel, let me identify five items where I thought the CCI specifically did. They screened referred accounts for barriers to collection. They independently composed and mailed letters to the debtors itself. It provided its contact info on letters and invited debtor correspondents. It handled debtor phone calls itself. It hosted a website where debtors could review. All of those activities go into the picture, do they not? And, first of all, I assume you would have to agree that all of those were in the record. They were all in the record, and that's an excellent question, Your Honor, because, again, back to Judge Talman's question, this is what Vincent looks at. All of those factors were in Vincent, and some of those factors are disputed. The review is disputed. Vincent looked at the review. Nielsen looked at review and said it's ministerial if you're looking at an up-down assessment, bankruptcy, duplicate information, whether the state prohibits those letters being sent in the state. This is the review that the record shows that CCI did here. That's what Nelson and Vincent looked at and said, that's not enough. It's ministerial. The other factors that the Court identified, such as handling phone calls, Vincent and Nielsen, same issue in those cases. And I'd, you know, note to the Court that Nielsen was affirming a summary judgment decision in favor of the plaintiff. Vincent, of course, was a reversal of summary judgment against the plaintiff. Handling debtor phone calls, because it's something the Court raised and we see repeatedly in the briefing, not only is that what the third parties did in the Vincent case, but it's not meaningful. And the reason it's not meaningful, Your Honor, is because the third party can't give substantive information to the debtor in that situation. Well, I thought substantive information, are you talking about what the bill was for in terms of what health services were provided? That would be included, but that's not it. But the problem is that HIPAA restricts the details of the patient's medical file. And that's not totally true. If you look at the Zabrick case, which is what CCI relied on, the Court acknowledged there that some information from a health care patient can be released for the purpose of debt collection. Emergency room visits, correct, at least for the named plaintiff? That's right. The putative class representative. That's right. Okay. So what more does she need to know besides that this is a bill for her visit to the emergency room? One example. Can you accept a partial payment plan? Can't give them that information. Can we negotiate a dispute? CCI can't give them that information. These are undisputed facts, right? And those were what was determinative, a couple of the determinative facts in the Vincent and the Nielsen case. So if you're putting only information on a letter and that's all that the third party can give you in a phone call, you've just wasted the debtor's time. They've contacted the third party. Well, I thought they created, I'll call it a file, I'm not sure that's the right term, and put it on a website that the debtor could access and that would tell the debtor sort of the payment history on the account, the amount that's owed, whether any payments had been made and credited to the account. That's what the allegation of CCI is, Your Honor, and that's, of course, what Judge Rothstein identified in her order. But being able to – I guess I'm having the same problem Judge O'Scanlan asked you about, and that is if all of those activities are true, why doesn't that take this out of a quote-unquote flat rate situation where the collection agency is simply lending its name and maybe letterhead to the creditor in order to send a dunning letter or two to the debtor? Because none of those factors were determinative in the only circuit cases we have looking at flat rating. Those factors were all present in these two circuit cases that I'm talking about, the Nielsen and the Vincent case, and they were not determinative. And in one of those courts, they go the other way. So to find out what is meaningful, many of these courts, including many of the district courts, they're looking at are they taking another step forward, such as initiating phone calls? Can they sue? I mean, that's what we see in the majority of the district court cases that CCI relies on. They're taking an act beyond letter writing. They're not done. Is your position then that the only acceptable financial arrangement would be the traditional transfer title to the debt and let the collection agency collect 35 percent or whatever the percentage is of whatever they collect? Absolutely not, Your Honor. That's why we highlighted on page 15 to 16 of our opening brief the 13 factors that courts like Hartley, like Larson looked at, so it provides district courts with guidance in this intensely factual situation. But the facts that the district court relied on in this case, and what you're going to hear CCI and PeaceHealth come up and talk about, aren't the material, meaningful facts that we've seen from the circuit decisions or distinguished the district court decisions. And we have not expressly adopted those 13 factors, have we? Nope. No, and the circuit courts didn't adopt those factors. They didn't need that many to make the decision. They have five or six in each of the Nielsen and Vincent cases. And sort of a totality of the circumstances, is it not, in terms of the analytical approach? Absolutely, and that's why we're not presenting to the court the argument that they have to own the debt or that they have to sue. But it's a factor that has to be considered. Those are the meaningful factors, among others, that I'll get back into in my rebuttal. I'm watching the clock here. You're relying on a Second Circuit and a Seventh Circuit case. What's the closest Ninth Circuit case, if any? We don't have one, Your Honor. The only district court case I'll identify for the court that came out of this circuit was the Becker case. And the court didn't look at, you know, didn't provide any analysis. What it did say, it was a pro se plaintiff, and it sounds like the court was confused because they applied the 1692J claim to a creditor. Our claim is a 1692A6 claim to the creditor who's acting as the debt collector and the J. So that is as close as we can get to those families, but it wasn't analytical of the factors. So the circuit needs some guidance here on what the rules are. That's right, and we encourage the court to look at the 13 factors. Yeah, and I guess I don't find that very satisfactory. A 13-factor test is not terribly helpful. So have you distilled any better legal principles that you might, you know, if you were writing the opinion, if all you're going to do is just say, hey, here's the 13 factors district courts have added, I don't think we've done a whole lot of good. Is there something more refined than that that you can offer? Yes, Your Honor, and we can, again, I'm going to sound like a broken record because I keep saying the word Vincent and Nielsen here. They decided not to look at 13 factors. Vincent could have, and they didn't. What they did is they looked at these five or six key components, and I'll do one hand is what the third party did, which is they take basic data, not detailed information that Judge Rothstein identified, basic data, so name, date of service, debt, address, dump it into a letter that has already been formed, a preformed letter and approved during a sales pitch years and years ago, populate the letter with, you know, the information that the creditor provided to them, send the letters out en masse, basically a day after the information is received, and in this case, after sending a second letter, close the account 35 days after it's received. But then don't they also run some sort of an indices check to see if the debtors filed for bankruptcy or whether the statute of limitation might have run on the claim? I mean, they're doing a little more than you're giving them credit for. They do, and that's why we keep referring to the ministerial review because that's exactly what happened in Nielsen. They looked to see whether the letters were allowed in certain states. You label it ministerial, but isn't that, in essence, an assessment that calls for a judgment call as to whether or not the debt is legally collectible? Sure, and I apologize for not being clear about what Nielsen meant when they said ministerial. What they said was ministerial was looking at bankruptcy records, looking to see if the letters were prohibited in the state, whether information was complete, or whether there was a duplicate. How would that be different from St. Vincent's or whoever it is, I'm sorry, PeaceHealth now, assigning or sending the file to a debt collection attorney who would do exactly the same thing? Would he or she not? Well, no, and the answer is what we see in the Foreman case. Wouldn't you look to see whether or not the debtor was judgment-proof before you spent a lot of time on the file? I meant to say, no, that's not it, Your Honor. So we can look to the Foreman case where you have a third party that does, say, where does the debtor live now? Has the debtor moved? And then they'll send an individualized letter based on their findings. They then exercise discretion based on this focused review to decide whether they're going to transfer the count over. I mean, that's a district court case, but it's an example that hopefully is responsive to your question about what more do they need to do. Before you sit down, could you address the district court's refusal to permit the amendment to add a 1692E5 claim at the summary judgment stage? I will, Your Honor. Thank you. 1692E was mentioned twice in our complaint. It's ER 63 and 64. It's mentioned twice. 1692E is a statute of general application. It says that in the statute that prohibits misleading and deceptive communications. Within that statute, there are 16 separate subsections. We didn't identify the subsections in our brief. Was this argument specifically addressed to the district court? Yes, it was. Part of the reason that our 1692E claim survives is because we included factual allegations in the complaint that said the letters contained threats that cannot be taken. Where did you say that in the complaint? Paragraphs 25 and 26, that's ER 62 of the complaint. There are two allegations that threats were made that cannot be taken, and that supports our 1692E claim. Okay. Thank you. I'm sorry. Say the pages again. ER 62 is the page in our complaint, and there are paragraphs 25 and 26, I believe, Your Honor. Great. Thanks. Thank you. Counsel, if you need to move that podium, there's on your left-hand side, there's a switch there. I think it's fine. Thank you. Okay. Whenever you're ready. All right. Good morning. May it please the Court, Counsel. My name is Cassandra Crawford, and I represent the FLA Computer Credit. I will be arguing for 10 minutes, and Counsel for myself will take five. Okay. This is an odd kind of debt collection case, because unlike the prototypical case, you have CCI here not just conceding but emphasizing that they are acting as a debt collector here. And Ms. Eklund is contesting that, and I think, in essence, saying that because CCI is not taking more aggressive actions, it's not really a debt collector. And to go to the factors that Judge Eskandlon was talking about, the fact that CCI screens this information for bankruptcy and for known attorney representation, it's looking at its files from prior collection activities because it represents multiple creditors, and as in the case of Ms. Eklund, sometimes it gets multiple accounts from a single creditor, and it has to make a judgment call as to whether the collection activity can begin in the first place. It controls the content and the timing of its letters. It reviews correspondence. And unlike Ms. Eklund's contention that CCI merely forwards these letters on to PeaceHealth, again, CCI is making a judgment. Does this letter require that we stop communication? Is this from an attorney? Do we need to make a note for our future records that we need to stop collecting against this person? And, by the way, it's also in the record that CCI would sometimes independently respond to consumers without PeaceHealth's involvement or, you know, permission at all. And that is all on top of the fact in the record that CCI engages in hundreds of debtor phone calls every week. Again, Ms. Crawford, my understanding on the 500 phone calls was it's 500 phone calls nationwide, right? So it's not necessarily 500 phone calls for PeaceHealth debtors. Yes, that is correct, Your Honor. Do you have any idea what percentage of the 500 would be attributable to the arrangement with PeaceHealth? Your Honor, I know approximately how many it is, but it is not in the record. You're teasing me. I know. I apologize. Go ahead. We make the rules. It is approximately 193 phone calls during the time period issued in this complaint. All right. 193 out of how many? Well, that would, I mean, I don't know if I can do the math of 500 per week, but during the course of the year at issue in the limitations period here, it was 193 calls. Total. Total from PeaceHealth debtors. All right. Okay. Yes. And I think to say that a debt collector that takes all of these actions is not really a debt collector, it's wrong as a matter of common sense, but also, you know, it's inconsistent with the text and the purpose and the legislative history in the FDCPA here. The FDCPA applies in general to debt collectors. It defines a debt collector as someone who is in the business of debt collection. Section 1692J, by contrast, is designed to impose liability on someone who sells forms, who is not participating in debt collection, and according to the legislative history, who is not actually in the business of debt collection. And that is undisputedly not the case here. And Ms. Eklund relies on Nielsen and Vincent, Your Honors, but neither one of those cases considered 1692J's text and the legislative history. Nielsen is a case under Section E as to whether a communication was from an attorney that was undisputedly a debt collector. There was no question that the attorney in that case was a debt collector. And, you know, for 20 years, the law in both the Second Circuit and the Seventh Circuit has been that if you are sending a letter that has a facsimile of an attorney's signature, that is almost never going to comply with the FDCPA unless that attorney has made it considered a professional judgment that that particular debtor is a candidate for collection. What about the Vincent case? The Vincent case, Your Honor, also did not consider 1692J. It's reserved for dueling footnotes in the dissenting opinion in that case. I will concede that, you know, the Court did look to 1692A6 and the false name exception, but that was wholly, you know, that the Court, again, did not actually look to the text and the history of 1692J. The footnote, I think, says that 1692J was not before the Court there. So I'd submit that the reasoning of either of those cases is not persuasive or controlling here. But we have an E claim here. Isn't it E10, or I don't remember which one got put? Put aside E5, because I think your position is probably right that that might not be before us. But there is an E claim here. I think the E claim here, Your Honor, is what Ms. Eklund is trying to say that PeaceHealth violated. I don't think that you can be both a debt collector and a, quote, flat rater under the FDCPA. The E claim is what she claims that PeaceHealth violated because PeaceHealth was the debt collector and, therefore, engaged in misleading activities in violation of E10. And throw them under the bus and say, hey, that's too bad for them. No, because they are, yes. Okay, I mean, their theory is that your guys' letters falsely represented that you were actually involved in the collection process when you really weren't, right? I mean, that's the theory for both the J claim and the E claim, right? Yes. So you're saying that there's daylight there, that you could be off the hook under J, but, hey, you know, I'm not going to speak to whether they're liable under E? No, no. I think there's no question that PeaceHealth is not liable under E. I mean, I think, you know, PeaceHealth is not using CCI's name to imply that CCI was participating because CCI was participating, right? I think my point there, Your Honor, was just that that's how E comes into the statute in the first place. They're not alleging that CCI in the complaint violated E. Well, maybe you're meaningfully participating and maybe you're not. But that's why I guess to me it's a closer question on the E claim. The J claim, I hear you. It seems like that is really the form, just the form scheme, right? Where that's all you've done is basically lent out your letterhead and your name to some creditor. And I grant you that's not what you've done, what your client has done. You've done certainly more than that. But there's still a question as to whether that what you've done is, you know, meaningful, or whatever the standard is, right? Sure. And I have two responses to that, Your Honor. I think the first is, and this goes back to a question that Judge O'Scanlan asked the first time around, is that the Ninth Circuit has certainly not squarely had any holding on this issue. But in Torgerman, which is cited in the briefs, there's a footnote that recognizes that the Ninth Circuit has not recognized meaningful involvement, quote, in the attorney context. And the footnote recognizes that meaningful involvement is unique to the attorney context and that the footnote says it doesn't apply to E10. So I think that the second response is that, you know, where you see this case law developing under E3 and the question of whether a letter is from an attorney, that's important for, you know, protecting consumers under the Act. Because if you get a letter from an attorney, there's a very specific connotation there, right? And the attorney cannot take advantage of that connotation. A letter from a debt collector in and of itself doesn't have a specific connotation. I mean, the implication of that. I guess especially applying the least sophisticated consumer standard, I would say that if somebody says, as your guys' letters do, we are debt collectors, we belong to the National Association of Debt Collectors, and you better pay up, this is your final notice, that to me conveys that you all are in the business of basically making people pay debts that they don't want to. So why wouldn't someone infer that legal action brought by your client is going to ensue? Well, I think that would collapse the distinction between some of the other case law out there that says, you know, a debt collector is not entitled to imply that it can take action that it's not going to take or can't take, right? So CCI certainly can't imply that it's going to take legal action. But if we say that it's misleading for a letter to say that we're a debt collector, if we don't actually sue on the debt, then that means the only way for us to comply with the FDCPA is for every debt collector to be a debt collector that sues. And I think there's room in the FDCPA for there to be someone between the flat rater, like you're recognizing, and the, as we referenced in the brief, extraordinary collection activities, which Congress has recognized are different. But then if that's – then you all aren't providing any value, it seems to me, right? Because that is precisely the coercive effect that your guys' letters have, is that the person, at least the non-sophisticated person, is going to think, my God, they're threatening me with something. They haven't spelled it out. I'll grant you that. But otherwise, you're not going to get your client, you know, any more money than otherwise would be obtained, right? But I think, Your Honor, you know, during – when we do engage with the consumers in the phone call, right, that we are adding value in that situation. And CCI, because it works with so many hospital and medical debtors, we're well-placed to help a consumer that says, well, I think my insurance paid. We can help walk them through that explanation of benefits, right, and find out. We can explain to them that if they sent in a check for $100 when they owe $1,000, if they actually want to, you know, not be in collections, they've got to set up a payment plan. If they have hardship, they can apply to charity care. We don't need to be administering, you know, a creditor's charity care program or, you know, be guaranteed to sue on the debt or do anything else in order to be encouraging debtors to pay, which I think is the definition of participation. But you all are implicitly threatening, especially in that final notice, you're implicitly threatening that if the person doesn't pay, you guys are going to take further action. Now, it doesn't say that, but I'm saying under the least sophisticated consumer standard, why wouldn't that be the natural inference someone would draw? Well, Your Honor, I think, you know, there's two different letters. The further collection activity is in the first letter. And in that case, we are sending, you know, an additional letter. In the second case, it just says that it's our last attempt and the final action. And I think there's... What do you think the average consumer who doesn't know the niceties of the FDCPA, what do you think the average consumer infers from that threat, that sort of this is your final notice, pay up, and then the, you know, the inference is kind of like or else, right? What are they supposed to infer from that? Sure. Well, I think that, you know, some of the cases we cited said that, you know, that this is, you know, it's going to get escalated from here. And I think in this case, that's completely accurate. You know, the fact that CCI was not itself suing, these debts did get referred to a different collector that had the power to sue. So it was, in fact, the last step of this early engagement process. Counsel, you wanted to leave five minutes for Mr. Fisher, who's anxiously getting out of his chair. I'm just leaning forward a little bit. Yeah, I could tell. All right. I was enjoying that argument so much. Good morning. May it please the Court, Brad Fisher here on behalf of PeaceHealth and really just taking five minutes to answer any questions that the Court has. I do have one. I guess it's an economic question. It appeared to me from reading the record that the reason that PeaceHealth does this is that this is a cheaper way and perhaps a more effective way to collect a debt than assigning the debt to a traditional debt collector who gets, I don't know what, a third or whatever the percentage is of whatever it collects. Sure, Your Honor. Right? I mean, is that why they enter into what counsel described as sort of people who work in the middle of the spectrum? Yeah, and I think that's right, Your Honor, but I think that's a good thing, and I think that as a— I'm not—my question wasn't pejorative. I'm just trying to understand the economics. Sure. Yeah, no, absolutely. I mean, and particularly in the context of health care, I mean, it's the right approach. I mean, PeaceHealth, you know, this is a mission-driven, not-for-profit entity, right, that gives away over $100 million in charity care a year. They work on hardships cases. We didn't get the chance to do that because Ms. Eklund never responded to anything. But of course, Your Honor, they're going to take an incremental approach, and I think now under the ACA, that's actually really what's required or intended. I mean, Congress wants clients like mine to be less aggressive, not more aggressive. And when you layer on top of that, Your Honor, that we have obligations under the state charity care law, okay, there are all kinds of reasons, good reasons, legal reasons, why PeaceHealth does not let go of these accounts for whatever may happen when a collector takes them over. It's not legal in some respects, and it's not good business. But absolutely, I mean, the idea here is there's an incremental approach to this. They're not suing. They're not reporting things on credit reports. They're not taking steps that are of a serious nature that would injure the consumer in this case. They're simply saying you're in collections. And really, when you distill this entire case down, their claim is that we were bluffing, right? We were trying to convince Ms. Eklund that we were going to take steps to collect on her account when we weren't. That is categorically untrue, and it's undisputed in the record. This account did go to the next phase of collection. It stopped once a lawsuit came in, you know, her ninth or tenth lawsuit under the FDCPA. We stopped because things get messy at that point. Counsel, I have a question having to do with the E-5 issue. I didn't have a chance to ask Ms. Crawford about it, but your opposing counsel relies on paragraphs 25 and 26 of the complaint to establish that not only was the issue raised, but it was discussed in the district court. What's your response? Well, if you'd like to know my main response, and I know there was a reference to me being thrown under the bus, not throwing CCI under the bus here, but just to be clear, that's not a claim against my client. Well, I realize that. That's why I mentioned that I didn't have a chance to ask your co-counsel. Yes. So as long as we have a common understanding on that, that that's a separate issue about the substance of their letter, because we're not, as a creditor, we are not derivatively liable for what is in their formal letter. So the E-5 is a separate case that we think it's a de facto amendment by way of reply brief, trying to bring that claim into it. What's the specific response to the 25-26 comment? The response, Your Honor, is I believe, if I have the liberty of speaking for Ms. Crawford and her client, that was not the claim. There was no reference to E-5. You don't have to have a reference in the complaint to the statutory section, as long as you make it clear what you're talking about. And it wasn't argued. I mean, it came up. We moved on what was in the complaint, what we took the depositions on, what the evidentiary record was, which was that we were flat rating. We litigated the cases on that basis. It was decided by Judge Rothstein on what I believe is an undisputed factual record. She reached the right result. I think this is a lawsuit looking for a claim not the other way around. We'd request that you affirm as to PSEL. Thank you. Thank you. We've got about four minutes. Thank you, Your Honor. Unless there are any urgent questions, I'd like to get right into my response to some of what you'd heard. Do you want to say anything more with respect to 25-26? I would be happy to, Your Honor. You know, if you looked at the language, I don't want to be redundant, but if you looked at the language, it very clearly says there were threats made that could not be taken by CCI. I guess I don't see that in those two paragraphs. Okay. Upon information at the time the letters were issued, CCI was not authorized. 25? Starting with 25, then I'll go to 26. CCI was not authorized to take legal action regarding the debts, did not own the debts. Where's the threat in that language, right? Okay. I guess what I'm referring to at that is that under 1692E, false or misleading representations. We say that in number 32. Yeah, I just think the theory you put forward in your complaint was that the false statement was CCI was representing that it actually was involved in the collection process when it really wasn't. Now, the shift you want to make under E-5, it's quite different, I think. If all you've got is 25 and 26, I think you kind of strike out there. If there's nothing else you've got other than these two paragraphs, I think you might want to use the rest of your time to talk about the other issues. Okay. I would just say an attempt to compel Ms. Eklund to pay is what we deem as a threat, and that's in 26. And this was extensively briefed in our response to summary judgment motion. There was an ample opportunity to discuss Section E with Ms. Eklund during a deposition. Not a single question was asked by either Peace Health or CCI. But the district court found that you hadn't adequately raised it to put the defendants on notice that they needed to conduct discovery on that issue. Well, from what we've said in the complaint, Your Honor, this is the claim that they are doing the collection, that they can take actions that they can't take, that they have authority that they can't take. And under the least sophisticated debtor standard, you know, an objective standard, the court doesn't look at what the subjective intent of the debtor is. But you're relying on line 10, the passage, an attempt to compel plaintiff to pay the alleged debt. Is that why am I zeroing in on your claim? Yes, Your Honor. That would be a part of it, yes. Well, what is it? I'm sorry. You're saying 1692E10. I thought you were referring to an allegation in a pleading. You're referring to the statute. Well, we're still on 25 and 26, the issue that you raised. So I just want to be sure that I understand the precise point you're making. You're relying on, to establish the threat language, you're relying on line 10 in the middle. Yes. An attempt to compel plaintiff to pay the alleged debt. That's your threat. That's right, Your Honor. I apologize. I didn't understand what the 10 was in reference to. I understand now. Thank you. Yes. Nothing more. Thank you. Yes. So I want to get in my final minute here. You know, there's a dispute about what is meaningful, a factual dispute about what's meaningful. You know, CCI cited the Federal Register, that's 53 Fed Reg, 50,109. Three actions are listed for what's meaningful. One of them, it's undisputed, cannot be done. That is negotiating payments. The other two, handling debt verification. That's disputed. CCI said, or I'm sorry, Peace Health says that debt verification comes from it. It sends the itemized statement, not CCI. So that's a dispute. The second thing, the second that is disputed, the third that's said in the Federal Register, is that they keep individual records. No records are sent, and they count as closed 35 days later. There's a dispute even under those two of the three factors. The other one doesn't apply. Finally, to the Section J argument, which was raised, Vincent did consider a J claim. It said in a footnote that it was a triable claim, but it had not been raised, so it didn't make a decision on it. Randall is a case the court should look at for summary judgment determination that there was a false belief created by the debt collector. Can I ask you just one question? Because I didn't feel like you gave me a satisfactory answer to the one question I asked you in your first go-around. So just as a legal principle, putting aside this 13-factor test, can you give us something that, to meaningfully participate in the collection process, you at least have to do X? Like, is there some just, you know, like, because the bar is here, and you're saying that they, you know, that they've got to get over this bar. Well, what's that bar? What do they at least have to do in order to be? You have to do more than write letters and take incidental actions based on that letters. Like, okay, what? What is it that you have to do that they're not doing that you think gets them above that legal bar? Verify debts. Negotiate payment. I mean, these are examples. Negotiate payment plans. Verify debts. Just mean, what does that mean? That means contacting the creditor and say, hey, is this the right amount? PeaceHealth says that doesn't happen here. That's ER 36. They say if. PeaceHealth send all the information as to the amount of the debt? To the debtor. To the CCI? No. It goes to the debtor. They send an itemized statement to the debtor. They do not want CCI doing that. So they can't verify the debt. There's a dispute on that point. We're back to the HIPAA issue, right? I mean, CCI knows what the amount that's due in owing is, correct, and whether or not the debtor has made any payments to PeaceHealth before the file goes to CCI. That's right. They just don't know what the specific medical services were that were provided to the debtor, and that gets into the HIPAA privacy concern issue. Well, the HIPAA privacy. Help me. Have I got the facts right here? Yes. Okay. Good. Yes. But that's why the 13-factor test is more important because it is harder for debt collectors in collecting medical debt. So if there are seven factors established but six go the other way, is that meaningful participation? That's the problem with the 13-factor test. Yeah. Well. I mean, we can run around like a squirrel chasing its tail. Yeah. And never figure out what meaningful participation means. Yeah. So, again, Vincent Nielsen, there are five or six factors there. All of those go our way in this case. Okay. Thank you very much. Thank you, Your Honor. The case just argued is submitted.
judges: O'scannlain, Tallman, Watford